IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 6, 2002

# STATE OF TENNESSEE v. MARLON MARKTAVIAS FITZGERALD

**Direct Appeal from the Criminal Court for Shelby County
No. 00-14523, - 14524    W. Fred Axley, Judge**

---

**No. W2001-03096-CCA-R3-CD  - Filed February 7, 2003**

---

The defendant appeals his convictions of first degree premeditated murder and first degree felony murder.  The defendant argues that the State did not present sufficient evidence at trial to support his convictions.  We disagree.  The defendant also argues the trial court erred in not charging the jury on second degree murder and voluntary manslaughter as lesser-included offenses of felony murder.  We agree but conclude the error was harmless and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

A C Wharton, Jr., District Public Defender, and Garland Ergüden, Tim Albers, and Trent Hall, Assistant Public Defenders, for the appellant, Marlon Marktavias Fitzgerald.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell and Lorraine Craig, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On October 11, 2001, the defendant, Marlon Marktavias Fitzgerald, was convicted by a jury for the first degree murder of Tina Long.  The jury convicted the defendant of first degree premeditated murder, first degree felony murder, and theft of property valued over one thousand dollars but less than ten thousand dollars.  The trial court merged the defendant's felony murder conviction and his premeditated murder conviction into one judgment for first degree murder.  The defendant was sentenced to life imprisonment for first degree murder and four years imprisonment for his theft conviction.

The defendant appeals the sufficiency of the evidence supporting his first degree murder

convictions of premeditated murder and felony murder. The defendant does not appeal his theft conviction. The defendant argues the trial court erred by not charging the jury on second degree murder and voluntary manslaughter as lesser-included offenses of felony murder.

## I. Facts

Anna Marie Booth, the mother of the victim, testified she last spoke with the victim on the morning of her death, Tuesday, August 1, 2000, around 6:30 a.m. She said the victim said her car had been stolen but did not say who had taken the car. She said that sometime after her phone conversation with the victim, she received a call from her mother informing her the victim was dead. She said a friend drove her to the crime scene, and police officers allowed her to view the victim's body.

Nichole House, a friend of the victim, testified that on August 1, 2000, she left for work at 6:30 in the morning and saw the victim talking on the telephone. She said the victim asked the defendant to return her car. She said she and the victim noticed that the victim's car keys and car, a white Hyundai Accent, were missing the day after she held a party at her apartment. She said the defendant called her apartment to tell the victim he had taken the car. She said the victim did not go to work until the evening, and the defendant said he would take the victim to work. She said the victim told the defendant she needed him to return her car so she could get her baby some milk. She said the victim threatened to call the police if he did not return her car.

House testified she returned to her apartment around 10:30 a.m. She said the victim did not answer the door. She said she entered her apartment through the kitchen and saw that it was "torn up" and saw "stuff thrown everywhere" in the living room. She said she found the victim lying on the living room floor and left to get help.

House testified to finding that several items and personal belongings were missing from her apartment on the day of the victim's death. She said her thirty-six-inch television and her nineteen-inch television were missing. She said the large television was worth approximately two or three hundred dollars and the smaller television was worth approximately one hundred dollars. She said she found the cord from the larger television beside the victim. She said that the victim kept a little black pouch strapped to her person which contained money and valuables. She stated the victim was wearing the pouch, which held two or three hundred dollars, when she left for work. She said the victim's money pouch was not found on her dead body.

On cross-examination, House testified the victim and defendant dated for approximately one and a-half years and spent nights together at her apartment. She said that, on the day following her party, the defendant phoned her apartment approximately twenty times to speak to the victim. She said she spoke with the defendant to demand he return her VCR that he admitted taking from her apartment. She said the victim called the police to report her car stolen.

On redirect, House testified she saw the defendant consume beer, but not drugs. She said

that, upon answering the defendant's numerous telephone calls, she never sensed the defendant was under the influence of drugs. On re-cross, she said she asked the defendant to return her VCR but did not ask the defendant to return the victim's car.

William Engram testified he had known the victim for more than fourteen years. He said House told him she found the victim lying on her apartment floor and that the victim would not awaken. He said he drove to the crime scene with Nichole House and her mother, Ms. Smith. Ms. Smith called 911 from the car. Engram said he entered House's apartment through the kitchen door and saw the victim lying on her back on the living room floor. He said he ran to the victim and tried to wake her by smacking her cheeks and ordering her to "wake up." Because the victim was unresponsive, he said he began CPR. He said he removed a cord wrapped around her neck and rolled her over, because the victim had blood in her nose and mouth. He said he and the apartment security guard continued the CPR until paramedics arrived. He stated that he did not touch anything in the apartment except for the telephone.

On cross-examination, Engram testified the lighting conditions were sufficient to view the interior of the apartment. He said he was trained by the Red Cross to administer CPR. He said the cord he removed from the victim's neck was looped around the victim's neck more than twice with the ends forward.

Officer Aaron Merritt testified he arrived at the crime scene at 11:04 in the morning, where he photographed and sketched the crime scene. He said that he was unable to obtain fingerprints from the crime scene. On cross-examination, Officer Merritt testified that it was his job to secure the crime scene, and he shared this responsibility with another officer. On redirect, he stated he usually photographed a crime scene in conjunction with completing a sketch.

Cedric Crump testified Erma Jane Cosby, a friend, introduced him to the defendant two days preceding the victim's death. He said the defendant drove him to Autozone to get a part for his car. He said the defendant drove a white Hyundai.

Crump testified the defendant phoned the victim from his apartment on the day of the victim's death. He said he overheard the defendant telling the victim he would return her car. He stated that the victim called his home on the morning of the victim's death and asked to speak to the defendant. He said he spoke to the victim while the defendant left his apartment to return the victim's car. He said the victim told him she was tired of the defendant running off with her car. He stated he was on the telephone with the victim when the defendant entered her apartment.

Crump testified the defendant returned, approximately thirty to forty minutes later, after his meeting with the victim. He said that the defendant told him that "some ni**er was over there." He said he told the defendant that he was on the telephone with the victim when the defendant walked into the victim's apartment and did not think there was anyone with the victim. He said the defendant told him he owned the car with the victim.

Crump testified the defendant came to his apartment later on the evening of the victim's death.   He said he told the defendant there was a murder in Whitehaven.  He stated the defendant became excited, said his girlfriend lived there, and ran from his apartment to use a pay phone.  He said the defendant returned after five minutes and screamed that his girlfriend was dead.   He said the defendant said the victim was found choked with a cable cord.

Crump testified  he called law enforcement to report the defendant as a possible suspect and later helped the police in locating the defendant.   He said that the defendant seemed happy prior to his meeting with the victim and did not seem to be under the influence of drugs.  He stated the defendant drank beer but never used drugs in his presence.  Crump admitted that he had been convicted for theft of property in 1994.

On cross-examination, Crump testified he first met the defendant with Erma Cosby on July 29th or 30th.  He said the defendant slept in the Hyundai, which was parked in his driveway, the evening before and the morning of the victim's death.   He said that on the evening of the victim's death, the defendant asked him if anyone wanted any televisions.

Sheila Denise Avant, girlfriend of Cedric Crump, testified she saw the defendant when he drove Crump to her house on Sunday.  She said a woman, identifying herself as Tina, called Crump's apartment that same day and asked to speak to the defendant.  She said she saw the defendant asleep in a white car in front of Crump's apartment on the morning of August 1, 2000.  She said Crump called her at work and had to end the conversation because the victim was on his other line.  She said the defendant came to Crump's apartment that evening.  She said that after the defendant heard that the victim was dead he said, "That ni\*\*er killed her," and "Somebody choked her with a cable cord." She said she copied the tag number from the Hyundai and Crump called the police. On cross-examination, Avant testified she went to Crump's apartment to get a ride to work and saw the defendant sleeping in the Hyundai.

Officer Bryant Brooks testified he responded to a call on Jefferson and Danny Thomas around one or two o'clock in the morning on August 2, 2000.  He said he found the victim's white Hyundai Accent at the apartment building.  He said the defendant was apprehended as he entered the driver side of the Hyundai. He said the defendant stated the car and house keys, in his possession, belonged to the victim.  He said the defendant was in his custody for approximately thirty minutes and did not appear to be under the influence of drugs or alcohol.

On cross-examination, Officer Brooks testified the defendant was cooperative at his arrest. He said he tagged the keys for identification and had the vehicle towed to the city lot.  He said the defendant appeared nervous during the thirty minutes in his presence.

Officer Paul Wright, Jr. testified that he interviewed the defendant about the victim's death. He said the defendant voluntarily offered the following statements regarding his knowledge of the victim's death.  On July 29, 2000, around 1:30 or 2:30 in the morning, the defendant went to the victims home.  On the way, he met a man named DeMarcus, who questioned him about his

relationship with the victim. He then confronted the victim about DeMarcus and they argued. The defendant left the victim's house at 5:00 a.m. in the victim's car. In the early morning hours or August 1, 2000, the victim called the defendant and asked him to return her car. The defendant then went to the victim's apartment and found DeMarcus sitting on her couch. The defendant was upset and left the victim's apartment with his clothes and the victim's car.

Officer Wright testified the defendant was given a break after the first interview and was then given a second interview. He said the defendant "broke down" and asked for a minister before giving another interview. Officer Wright read the following excerpt from the defendant's statement into the record.

> We was supposed to be talking like she wanted to. She told me she had nothing to say to me and probably would never - - say anything else to me. I told her that if I couldn't be with her, I didn't want to be with any - - with nobody else. She told - - she said, What you mean by that? I told her that I would kill myself. She said, Stop playing and be for real. And she walked to the back. When she came back in the living room, I was trying to choke myself with the cable cord, and she ran over there to me. Next thing I remember, she wasn't moving. I got scared and grabbed my clothes. I got the TV's to pawn then so – excuse me. I got the TV's to pawn them so I could try to get a bus ticket to go out of town, and I left.

Officer Wright then read the rest of the defendant's statement into the record.

On cross-examination, Officer Wright testified that the defendant was not asked about taking the victim's car. He said the defendant told him he was returning the car to the victim. He said he asked the defendant if he went to the victim's home with the intent to kill the victim. He said the defendant claimed his intention was to make up with the victim. He said the defendant told investigators he was not a drug user.

Janice Peters, of the Shelby County Clerks Office, testified that it is her duty to maintain the registration records for vehicles in Shelby County. She stated her records indicate the victim, Tina Long, is the registered owner of a white Hyundai Accent with a license number of DAF529. She said her records indicate the victim purchased the car on May 19, 2000, registered it on June 21, 2000, and maintained continuous sole ownership of the car.

Dr. Cynthia Gardner, a medical examiner employed by the Regional Forensics Center of the Shelby County Medical Examiner's Office, testified that she performed the victim's autopsy. She said the victim died as a result of smothering, as evidenced by the extensive damage to the mouth. She said she observed the crime scene and saw the cord that was alleged to have been wrapped around the victim's neck. She said there was no indication the victim suffered ligature strangulation. She said smothering a victim, who is capable of putting up a fight, would take five or six minutes, however, the victim would lose consciousness after a few minutes. She said the victim's injuries indicate someone placed his hands over her face, nose, and mouth to hold them shut. On cross-examination, Dr. Gardner testified the victim weighed two hundred and ninety-nine and one-half pounds and was five feet and seven inches tall. She said the victim had no foreign material under

her fingernails and had no injuries to her hands or nails. She said the ligature marks on the victim's neck could have been caused from lying on the cable cord or any pressure from the cord on her neck. On redirect examination, Dr. Gardner testified that someone held the victim's mouth shut to such an extent that it caused severe injuries to her tongue and mouth.

The defense called Renatta Keys and the defendant to present their testimony. Ms. Keys, the defendant's mother, testified she met the victim on several occasions and saw the defendant drive the victim's car. The defendant testified he had known the victim for eleven months.

The defendant testified to his recollection of the events of July 28, 2000. On this night, he and the victim attended a party and spent the night at Nichole House's apartment. He left the party for several hours and consumed cocaine. He spent several hours arguing with the victim before leaving House's apartment at 3:30 a.m. to do more drugs. He went to Cedric Crump's house at 9:30 a.m. Crump paid him with crack cocaine for driving him around town. He got high for two days and slept very little. He made many phone calls to the victim from Crump's apartment, and they would argue. He chose to stay away from the victim because they were arguing.

The defendant testified to his recollection of the events on Tuesday morning before the victim's death. He smoked a rock of cocaine before visiting the victim. Upon entering House's apartment, the victim began shouting at him. He told the victim that he did not want to be with anyone else if he could not be with her. After arguing with the victim in the middle of the living room floor, he tried to choke himself with a cable cord by wrapping the cord around his neck. The victim tried to take the cord away from him. He doesn't remember anything after grabbing the victim. He saw the victim lying on the floor and didn't know what to do. He gathered his clothes and a twenty-five-inch television before leaving. The defendant testified he did not wrap a cord around the victim's neck. He said he dumped the television in a gas station's garbage can before returning to Crump's apartment. He denied asking Crump if he wanted to buy a television.

On cross-examination, the defendant testified that he had not been truthful concerning some of his earlier statements to the police. He said he smoked approximately twenty-two rocks of crack cocaine and had not slept for days prior to the victim's death. He said he did not remember what happened immediately prior to seeing the victim lying on the floor. He said he did not admit to police that he is a drug user. He said he did not take the victim's money pouch from her body. He said he did not call 911 and did not seek help for the victim. He said he had never done anything like this before but said he was convicted of assault on April 28, 1999. The jury convicted the defendant upon the foregoing evidence.

## II. Analysis

The defendant contends the evidence is insufficient to support his convictions for premeditated murder and felony murder beyond a reasonable doubt, as required by Jackson v. Virginia and Rule 13(e) of the Tennessee Rules of Appellate Procedure. See Jackson v. Virginia, 443 U.S. 307, 317 (1979); Rule 13(e), Tenn. R. App. Procedure. The defendant asserts that he

deserved a conviction no greater than second degree murder or voluntary manslaughter.  We disagree.

## A.  Sufficiency of the Evidence

When the sufficiency of evidence is questioned on appeal, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).  We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State.  State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory."  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  "Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence."  State v. Waldo Wiggins, Jr., 2001 Tenn. Crim. App. LEXIS 974 at 25*, No.W2000-02766-CCA-R3-CD, (Tenn. Crim. App. at Jackson, Dec. 14, 2001) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998).  A conviction may be based upon circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'  State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)).  Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury.  Id.; see also State v. Tuggle, 639 S.W.2d 913-14 (Tenn. 1982).  In the instant case, the defendant confessed that he was responsible for the victim's death but argues that he is not guilty of first degree murder and insufficient evidence exists to support his conviction of premeditated murder or felony murder.

### 1.  First Degree Premeditated Murder

The defendant argues the evidence of premeditation is insufficient to support his conviction of premeditated murder when properly viewed against the high standard of Jackson v. Virginia.  Jackson, 443 U.S. at 317.  We disagree with the defendant and favor the State's assertion the evidence is sufficient to sustain the defendant's premeditated murder conviction.

The defendant was convicted of first degree murder, a violation of Tennessee Code Annotated section 39-13-202(a)(1), which is defined as the premeditated and intentional killing of

-7-

another. A premeditated killing is one done "after the exercise of reflection and judgment" and requires that "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It is not necessary that the intent to kill pre-exist in the mind of the defendant for any specific length of time, but "the mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id.

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). A jury may infer a defendant's intent from the surrounding facts and circumstances. State v. Lowery, 667 S.W.2d 52, 57 (Tenn. 1984). Furthermore, a defendant's actions constitute circumstantial evidence of his intent. State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

Our supreme court has listed several factors that may support the existence of premeditation and deliberation, including: (1) declarations by the defendant of an intent to kill, (2) evidence of procurement of a weapon, (3) use of a deadly weapon upon an unarmed victim, (4) particular cruelty of the killing, (4) infliction of multiple wounds, (5) preparation before the killing for concealment of the crime, (6) destruction or secretion of evidence of the murder, and (7) calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Deliberation is no longer an element of first degree murder in Tennessee, however, the two elements are considered similar. See id. (Factors used by the court were relevant to either premeditation, deliberation, or both.)

After considering the evidence in a light most favorable to the State, the evidence presented points to at least two of the above factors from which the jury could infer premeditation. The testimony of Dr. Gardner, the medical examiner, illustrated the particular cruelty of the killing. Dr. Gardner testified the victim's injuries were consistent with someone placing his hand over her face, nose, and mouth and holding them shut. Dr. Gardner testified the smothering would take from five to six minutes to kill a victim capable of fighting her assailant. The defendant would have had five or six minutes to change his mind about killing the victim but maintained the sufficient force and state of mind to accomplish his task. Next, the defendant's calmness following the murder may be inferred from the testimony concerning the defendant's behavior. Crump testified the defendant returned to his apartment within an hour of the murder. Crump testified he asked the defendant about his meeting with the victim, and the defendant responded by stating he found the victim with another man. Crump stated the defendant did not respond to his assertion that he did not believe that another man was with the victim. Crump testified he asked the defendant if the victim allowed him to use her car, and the defendant misrepresented himself as joint owner of the victim's car and then attempted to sell him a television. The defendant's own testimony illustrates his calmness as he spoke to the police and to the jury concerning his actions following the murder. The defendant testified he practically had to climb over the victim's dead body to pull a twenty-seven-inch television out of an entertainment console. The defendant testified he then stopped by the kitchen to set the television on the floor before picking up the victim's car keys. The defendant testified he

placed the television in the victim's trunk and managed to gather his clothes before leaving in the victim's car. Despite being intimately involved with the victim for, at least, ten months, the defendant demonstrated a chilling lack of concern, as evidenced by his unwillingness to seek help or to place a 911 call. The jury could have inferred from the testimony that the defendant acted in a relatively normal manner after killing the victim and did not express any remorse, regret, or surprise that would indicate the killing was of an accidental or reckless nature.

The defense theory was based upon the premise that the sleep-deprived defendant consumed such a quantity of crack cocaine that he could not form the culpable mental states of intent and premeditation. The trial court allowed evidence of the defendant's use of crack cocaine and properly instructed the jury that voluntary intoxication could negate the defendant's culpable mental state. Tennessee Code Annotated section 39-11-503(a) provides that while voluntary intoxication is not a defense to prosecution for an offense, evidence of such intoxication may be admitted to negate a culpable mental state. See also State v. Phipps, 883 S.W.2d 138, 148 (Tenn. Crim. App. 1994). The defense argument that the defendant lacked the requisite mental state for premeditated murder is not persuasive. The only evidence of intoxication comes from the defendant's own testimony. In his statement to police, the defendant confessed responsibility for the victim's death and did not admit to being under the influence of drugs. Witnesses stated that the defendant was not known to abuse drugs and that he acted in a sober and coherent manner prior to and after the victim's death. Furthermore, the defendant's conduct in traveling to the victim's home, removing items from the crime scene, and completing his escape after the killing belies the claim that he was incapable of premeditation. See State v. Hall, 8 S.W.3d 593, 600 (Tenn. 1999).

Whether premeditation exists is for the jury to decide. See State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000). Having reviewed the entire record, we conclude that a jury could have found the essential elements of premeditation and intent beyond a reasonable doubt. The defendant has not met his burden of proving the evidence insufficient to support his conviction for premeditated murder. For the aforementioned reasons, the defendant is not entitled to relief on this issue.

**2. First Degree Felony Murder**

The defendant contends the evidence is insufficient to support his conviction for felony murder in the perpetration of theft. The defendant was convicted of felony murder in violation of Tennessee Code Annotated section 39-13-202(a)(2). Felony murder is defined as a "killing of another committed in the perpetration of . . . any . . . theft." Tenn. Code Ann. § 39-13-202(a)(2). The defendant was convicted of theft of property valued over one thousand dollars, but less than ten thousand dollars, in violation of Tennessee Code Annotated section 39-14-103. The defendant does not contest his theft conviction. The statute under which the defendant was convicted does not require a culpable mental state other than the intent to commit the underlying felony. Tenn. Code Ann. § 39-13-202(a)(3)(b).

Testimony revealed the defendant had taken the victim's car without her permission, and the two were engaged in a dispute over the return of the car. Nichole House testified that on the day of

the murder, the victim threatened the defendant with police action if he did not return her car. The defendant testified that he went to see the victim for the purpose of reconciling their relationship. However, the jury could have determined that the defendant agreed to return the victim's car only after the victim threatened him with filing a police report. House testified the victim's money pouch, which contained two to three hundred dollars, was missing from her body after the murder, as well as two televisions from House's apartment. Moreover, the police apprehended the defendant as he was getting into the victim's car. The defendant confessed to stealing a television from the crime scene and disposing of the incriminating evidence in a gas station trash receptacle. Crump testified the defendant asked him if he knew of anyone wanting to buy a television. These facts provide ample evidence from which a jury could find beyond a reasonable doubt that the defendant committed felony murder.

Our supreme court has held that "in a felony murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). The court held that intent to commit the underlying felony may not be presumed from the act of committing that felony. Id. The jury may infer from a defendant's conduct immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing. Id. In the instant case, the defendant accepts responsibility for taking the victim's car without her consent, killing the victim, and taking a television from the crime scene. The defendant does not appeal his theft conviction. However, we note the defendant's theft convictions are based only on the theft of property owned by the victim. The victim died in Nichole House's apartment; therefore, the items taken from the crime scene belonged exclusively to House and are not included under the defendant's indictment and conviction. We conclude that a jury could reasonably infer from the defendant's actions immediately before and after the victim's death that the defendant intended to steal the victim's car and other valuables from the victim, totaling a value over one thousand dollars, but less than ten thousand dollars, when he smothered the victim.

## B. Jury Charge

The defendant contends the trial court erred by not charging the jury on second degree murder and voluntary manslaughter as lesser-included offenses of felony murder. We agree. Defense counsel asked the trial court to charge the jury with the lesser-included offenses of felony murder, separately, from its charge to the jury concerning premeditated murder and its lesser-included offenses. The record reflects the defense counsel's concerns regarding jury confusion with the possible application of lesser-included offenses for premeditated murder and not for felony murder. The trial court explained to the jury that felony murder "embraces and includes the lesser offenses of Murder in the Second Degree and Voluntary Manslaughter." However, the trial court did not specifically charge the jury with the lesser-included offenses for felony murder. At the time of trial, our Code required that a trial court must charge the jury with all lesser offenses included in the indictment, without any request on the part of the defendant to do so. Tenn. Code Ann. § 40-18-110(a)(1997) (repealed 2001).

It is established that second degree murder is a lesser-included offense of felony murder. State v. Ely, 48 S.W.3d 710, 721-22 (Tenn. 2001). Although voluntary manslaughter was not discussed in Ely, we conclude "reasonable minds" could have accepted guilt on second degree murder or voluntary manslaughter and supported these offenses if the jury had so chosen. If an offense is found to be a lesser-included offense, the court must next determine whether the evidence justified a jury instruction on the lesser-included offense. State v. Bowles, 52 S.W.3d 69, 75 (Tenn. 2000). In the instant case, the trial court stated its intentions to charge the jury with lesser-included offenses of felony murder, but simply failed to do so. To our dismay, the record reflects the trial court's cavalier attitude toward giving complete jury instructions by stating, "we don't charge the jury for the jury's benefit; we charge the trial at the end of it for the Court of Criminal Appeals and Supreme Court." We remind the trial judge that the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. The defendant has a constitutional right to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). We conclude the trial court's inappropriate statements to be indicative of a lack of respect for the constitutional rights of defendants and the intellect of jurors. In State v. Alfonzo Williams, the trial court charged a jury with lesser-included offenses of premeditated murder, but the structure of the jury charge did not allow the jury to consider them as lesser-included offenses of felony murder. See State v. Alfonzo Williams, 2002 Tenn. Crim. App. LEXIS 234, No. W2001-00452-CCA-R3-CD (Tenn. Crim. App., at Jackson, March 15, 2002). As in Williams, we conclude the failure to charge the jury with the lesser-included offenses of felony murder was error. See id.

The State contends the failure to charge the lesser-included offenses was harmless error. Our supreme court has applied harmless error where the jury was instructed on at least one higher lesser-included offense, and the jury convicted on the greater offense. State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998). Harmless error must be established beyond a reasonable doubt. Ely, 48 S.W.3d at 727. The guiding principle is that if there is evidence in the record from which the jury could conclude that a lesser-included offense was committed, there must be an instruction for the lesser offense. See Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). In our previous discussion regarding the sufficiency of the evidence, we established the evidence was sufficient for any rational trier of fact to have found the defendant guilty beyond a reasonable doubt for premeditated murder and felony murder. The jury chose to reject the lesser-included offenses of premeditated murder and convicted the defendant of the greater offenses of premeditated murder and felony murder. The trial court then merged the two first degree murder convictions into one judgment of guilt as to first degree murder. However, we do conclude the trial court erred in not charging the jury with complete instructions as to the lesser-included offenses of felony murder. Our supreme court has held that "an erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Allen, 69 S.W.3d 181, No. E1999-00416-SC-R11-CD, (Tenn. Feb. 22, 2002), slip op. at 189. In determining whether the improper omission of a lesser- included offense was harmless beyond a reasonable doubt, " a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id., slip op. at 191. The jury chose to convict the

defendant of premeditated murder after being charged with its lesser-included offenses. Given our extensive review of the record, we conclude that the trial court's failure to instruct the jury on the lesser-included offenses of felony murder did not alter the jury's intentions of convicting the defendant of first degree murder. Therefore, we conclude the trial court's failure to instruct the jury on the lesser-included offenses of felony murder was harmless beyond a reasonable doubt.

### III.  Conclusion

Accordingly, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE